## UNITED STATES of America

v.

## Louis KOSMA.

### Crim. No. 89–00474.

United States District Court, E.D. Pennsylvania.

Nov. 6, 1990.

---

Joan L. Markman, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Michael Kelly, Philadelphia, Pa., for defendant.

### MEMORANDUM

O'NEILL, District Judge.

#### I. *Introduction.*

This is a non-jury criminal matter. Defendant Louis Kosma is charged in counts one and two of the superseding indictment with making threats on the life of the President of the United States in violation of 18 U.S.C. § 871 and in count three with making threats on the life of a former President of the United States in violation of 18 U.S.C. § 879. The offenses charged in counts one and two are alleged to have

occurred, respectively, on March 2, 1988 and April 20, 1988. The offense charged in count three is alleged to have occurred on May 10, 1990 while Kosma was incarcerated and awaiting trial on the original indictment.

Prior to trial Kosma requested and was granted a competency examination which was performed by Dr. Michael Natale and Dr. Ira Herman, M.D.. Their report stated that Kosma was competent to stand trial. Dr. Natale confirmed this finding immediately prior to trial. Dr. Natale and Dr. Herman were also appointed prior to trial upon Kosma's unopposed motion as experts under F.R.E. Rule 706(b) for the purpose of evaluating Kosma's mental state and condition at the time of the commission of the offenses charged in the superseding indictment.

Prior to trial Kosma filed notice pursuant to Fed.R.Crim.P. 12.2(b) of his intention to introduce expert testimony regarding his mental condition. The government filed a motion *in limine* seeking to limit the scope of the expert testimony to count three. I deferred ruling on the government's motion *in limine* and heard all the expert testimony proffered by Kosma. The government and Kosma have now briefed the issues involved in this action. For the following reasons, I find Mr. Kosma guilty on counts one and two of the superseding indictment and not guilty on count three.

#### II. *Summary of Evidence.*

##### A. Government's Evidence.

The government's evidence consisted of eight written communications which Kosma made concerning President Reagan. Kosma sent these communications to President Reagan or to other persons in positions of authority within the Reagan administration. Government exhibits 1 through 3 were the communications which the government alleged constituted the offenses charged in counts one through three. Government exhibits 4 through 8 were communications sent to a presidential assistant, Marlin Fitzwater, in July, 1988. Government exhibits 4 through 8 were ad-

mitted into evidence under F.R.E. Rule 404(b) without objection.

The contents of government exhibits 1 through 3 are as follows:

1. (a) A postcard[1] postmarked March 2, 1988[2] addressed to President Reagan, "C/O Ye Ol Whitehouse" with the return address of "Louis A. Kosma (acting Director. FBI) ..."

(b) The text of the postcard states in full:

Mr. Reagan: You are hereby invited to PHILADELPHIA. We are going to give you a 21 Gun–Salute.

21 guns are going to put bullets thru your heart and brains. You are a Disgrace to the Air–Force. You are a Disgrace to Teddy Roosevelt. You are a Disgrace to John F. Kennedy. You are a Disgrace to Nancy Reagan. You have insulted her intelligence,and dignity,and honor,and integrity,and I resent this very much.!! You are in contempt of EVERYTHING that I represent,and standby,and believe. Officially, an Act of Contempt of Court. Your name is going to be removed from ALL documents,and books.OFFICIALLY: you were NEVER the "president" of anything.!!

2. (a) A document variously entitled "Official Court Order", "Official Proclamation" and "Motion to Proceed In Forma", dedicated to the "memory of" eleven persons, including four past presidents. The text of the document states:

To: Wilson Goode

Ronald Reagan

WHEREBY: You criminals have caused many Crimes against Humanity, and it would be Futile for you to seek Justice. YOU CAN ONLY SEEK MERCY.!! "Give me Liberty or give me Death." WE can NOT give you Liberty, but we can give you Death, to end your Mental Anguish.!!

You should choose an Honorable Death. You are hereby ORDERED to Philadel-

phia,Penna. We are going to give you a 21 Gun–Salute. *Twenty-one guns are going to put bullets thru your heart & brains.* Place: FEDERAL COURTHOUSE.. 601 Market street. Time: 6:o'clock am. Date: June 14th.1988.Flag Day.

The document is signed by the defendant but purports to be from a "Senior Commander.REGIONAL TASK FORCE" and the "U.S.MARINES".

3. (a) An envelope post-marked May 10, 1990 and addressed to "RONALD REAGAN.EX–PRES."

(b) A letter which states:

Dear Mr. Reagan,

You are invited to Phila, Penna. You are invited to an act of EUTHANASIA. You are invited to a 21 gun salute. 21 guns are going to blow holes in your heart and brains. You should pick an honorable way to die. You are a disgrace to your wife Nancy. You are a disgrace to the U. S. of A. You are all mouth except your ass, and that sucks canal water. If brains were dynamite, you couldn't blow your nose. You are an incorrigable, incurable, loathsome scum of the earth. How the fuck did you get to be president anyway? What are you going to do with $7,000,000 from that publisher ? Why did you take an il-legal tax rebate of $23,600 1985 1986 ?

I'm signing off.

10–04

Aufwiedersein,

Louis A. Kosma

Government exhibits 4 through 7 are envelopes postmarked July 4, 1988 and written material contained in the envelopes. Exhibit 8 is a similar envelope and letter postmarked July 5, 1988 and written material. All of the envelopes were addressed to a presidential assistant, Marlin Fitzwater, and all of the written material is similar in appearance and content. The writ-

---

1. Kosma's Memorandum of law refers to government exhibit 1 as an envelope and letter. *See* Defendant's Memorandum of law, at 2. Government exhibit 1 is in fact a postcard.

2. *Kosma states that the postcard is dated March 2, 1988. See Defendant's Memorandum of law, at 2. Although the postmark is partially obscured, I believe that the postcard is actually dated March 21, 1988.*

ten material purports to be arrest warrants and/or death sentences for various crimes. All are purported to be signed with the names of several judges.[3]

### B. Defense Evidence.

The sole evidence which the defense presented was the testimony of Dr. Natale regarding his and Dr. Herman's diagnosis of Kosma's medical condition. According to Dr. Natale, the evaluation of Kosma "consisted primarily of three different features." Transcript of August 23, 1990, at 11.

First, Dr. Natale conducted an interview with Kosma in which Dr. Natale received information which permitted him to "draw conclusions as to diagnosis and to write a clinical summary." *Id.* Second, Dr. Natale administered to Kosma two psychological tests, an "objective" test called the MMPI which, according to Dr. Natale, Kosma was unable to complete because of "concentration difficulties" which Dr. Natale considered "genuine", *id.*, and a Rorschach evaluation. Dr. Natale testified that the Rorshasch evaluation is a "projective psychological test" which one of Dr. Natale's assistants performed under Dr. Natale's direction. *Id.*, at 11–12. Third, Dr. Herman conducted a twenty-five minute interview with Kosma for the purpose of determining whether Dr. Herman had "any perception or observations that would contradict [Dr. Natale's] basic findings". *Id.*, at 12.

Dr. Natale testified that he was "quite sure that [Kosma] suffers from schizophrenia, paranoid type." *Id.* However, Dr. Natale also "offer[ed] a differential of schizophrenia, paranoid type or schizophrenia, residual." *Id.* According to Dr. Natale, the difference between the two disorders is that in the case of the former (paranoid) type, a person's schizophrenia "is predominated by a paranoid thought style", while in the case of the latter (residual) type a person's schizophrenia "is predominated by a general pattern of emotional and social deficits associated with schizophrenia." *Id.*

Dr. Natale testified further concerning Kosma's mental health. According to Dr. Natale, during the interview Kosma made certain remarks about President Bush. In response to a question concerning whether Kosma's words had meaning and his sentences structure, Dr. Natale stated that Kosma "was able to communicate with no clear disturbances of speech and language." Kosma's sentences were "coherent", and "responsive to questions that were relevant." *Id.*, at 15.

At the conclusion of the direct examination of Dr. Natale the following colloquy occurred:

Q: So far as you're able to tell, sir, with regard to his particular fixation and compulsion, ... to the extent he gives into [sic] it, would it appear to be satisfied by actually making a written communication ... or would it possibly lead to additional activities on his part?

A: It is my perception that most of his emotional investment is in the act of communication, okay, that he [has] in all likelihood not organized a plan or a series of ideas on the carrying out of his specific threat. It seems as if the actual letter and the content of the letter would be read and the thought that the letter would be read and understood, that that constitutes the threat in his mind.

Q: Sir, with regard to your statement just now that he would be in effect satisfied with the feeling that the letters were understood, are you able to say whether or not that compulsion and that fixation ... requires statements by him however convoluted stating his opposition to [public officials] or is that not necessarily part of his compulsion?

A: I don't believe that his fixation ... takes the form of him stating opposition. A sublimated aggressive stance is what's

---

**3.** See for example government exhibit 6. In this "official death sentence" and "warrant" Kosma called President Reagan "Lucifer" and "Satan" and accused the President of "violating the principles of John F. Kennedy and Martin Luther King, Jr.", aiding and abetting the plight of South Africa", "aiding and abetting the plight of small farmers", and of "collaborating with the Japanese and French".

probably going to come out in the letters, and it seems to reflect the pattern of previous communication on his part. So it would not be just an abstract communication of his objections. It would probably contain the same elements of imagery and suggestion. He was very careful in his statements with me—not careful, consistent I should say—that he did not intend to threaten the President. Nonetheless, he was obviously very fixated on using a particular set of words and phraseology and imagery that would constitute a threat by most people's perceptions. So the emotional investment is in expressing something that has an aggressive element to it. It's not—as I said, I'm not at all convinced that he has any intentional plans or for that matter ability to organize a response to follow through on any kind of threat.

*Id.*, at 19–21.

On cross-examination, in response to a question as to whether Kosma "has the capacity to understand the content of the words ... in Government Exhibits 1, 2 and 3?", Dr. Natale testified:

A: This gets into a difficult situation. I believe at the time that I evaluated him that he understood. I only asked one specific question that related apparently to the content of one of his written communications, and at that time he recited a phrase or a sentence that he had written. And he did understand the content of that phrase. He differed regarding the interpretation of it, but he understood the content.

*Id.*, at 23. Dr. Natale then added:

A: It is difficult for me to determine at the time of production of these documents what his mental state would be, and I do not feel qualified to comment on what his understanding was at the time of production of these documents.

*Id.*, at 24. Finally, Dr. Natale testified as follows:

Q: ... Based on your review of these tests of Mr. Kosma and your discussions with him at the time you evaluated him, is it your opinion that he had the mental capacity, the intellectual capacity, to distinguish between what would be a threat and what would not be a threat?

A: He had the capacity to understand the concept of threat, and he focussed extensively in his comments to me that he would use the word "invite" in the letters, and that in his mind seems to constitute that if you invite someone, you're not forcing them. And if you're not forcing them, you're not threatening them. I do notice in one of these communications he does not use the word "invite." That—

Q: Is that Exhibit 1?

A: But I did not have that available to me at the time and I didn't question him on that. In Exhibit 2 he uses the word "ordered."

Q: Okay. Based on your conversations with Mr. Kosma, do you have an opinion about whether he has the mental capacity to foresee how words that he uses may be construed by the people to whom he addresses them?

A: I think he has the capacity to understand what the words mean and possibly what they would mean to someone else. Where he gets confused is probably what they mean to himself.

*Id.*, at 24–25.

III. *Discussion.*

There are two areas of inquiry in this case. First, I must determine whether Kosma's statements are protected under the First Amendment. Kosma asserts that his statements implicate First Amendment rights to free speech and are not "true threats". If the statements are not protected, then I must determine the proper tests to apply in determining whether the statements which underlie counts one and two violate 18 U.S.C. § 871 or whether the statement which underlies count three violates 18 U.S.C. § 879.

A. The Statements at Issue in All Counts of the Superseding Indictment Constitute True Threats.

 The government and Kosma agree that a threshold issue in this case is whether the statements at issue are "true

threats". This is an issue which implicates the protections of the First Amendment. In *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court stated "... a statute such as [18 U.S.C. § 871], which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Watts,* 394 U.S. at 707, 89 S.Ct. at 1401.

In *Watts* the defendant stated in a group discussion after a political rally,

> They always holler at us to get an education. And now I already have received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers.

*Id.,* at 706, 89 S.Ct. at 1401. In reversing the defendant's conviction under section 871, the Supreme Court stated:

> We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 [84 S.Ct. 710, 720, 11 L.Ed.2d 686] (1964). The language of the political arena, like the language used in labor disputes, *see Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 58 [86 S.Ct. 657, 660, 15 L.Ed.2d 582] (1966), is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the

listeners, we do not see how it could be interpreted otherwise.

*Watts,* 394 U.S. at 708, 89 S.Ct. at 1401–02.

The determination of whether a statement is a true threat is for the trier of fact. *See United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982); *United States v. Howell,* 719 F.2d 1258 (5th Cir.1983), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). "Whether a defendant's words constitute a true threat under 18 U.S.C. § 871 must be determined in light of the entire factual context of the defendant's statements." *United States v. Mitchell,* 812 F.2d 1250, 1255 (9th Cir.1987) (citing *Watts,* 394 U.S. at 708, 89 S.Ct. at 1401). "The court may look at the surrounding events, the reaction of the listeners, and whether the words are expressly conditional." *Mitchell,* 812 F.2d at 1255 (citing *Watts,* 394 U.S. at 708, 89 S.Ct. at 1402).

In this case, Kosma's statements in counts one and two were specifically directed to the President and were sent directly to the President and Kosma's statement in count three was specifically directed to an Ex–President and was sent directly to an Ex–President. The statements are not conditional. The postcard which is the basis of count one of the superseding indictment states in part: "We are going to give you a 21 Gun–Salute. *21 guns are going to put bullets thru your heart and brains.*" (emphasis added). The letter which is the basis of count two states in part: "We are going to give you a 21 Gun–Salute. *Twenty-one guns are going to put bullets thru your heart & brains.*" (emphasis in original). The letter which is the basis for count three states in part: "You are invited to a 21 gun salute. *21 guns are going to blow holes in your heart and brains. You should pick an honorable way to die.*" (emphasis added). Kosma concedes that "there are statements in exhibits 1, 2 and 3 which reflect an *apparent* intention to injure the President...." Defendant's Memorandum of law, at 27 (emphasis in original). Therefore, having considered the circumstances surrounding Kosma's state-

ments,[4] I conclude that all three of the statements at issue constitute true threats.

## B. The Elements of 18 U.S.C. § 871.

■ In Counts one and two of the Indictment, Kosma is charged with violations of 18 U.S.C. § 871. That section provides, in pertinent part,

> (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, . . ., or to inflict bodily harm upon the President of the United States, . . ., shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 871(a).

In his memorandum of law, Kosma urges me to adopt a minority interpretation of the willfulness component of section 871. Kosma admits, candidly, that under the prevailing majority view of section 871 his conduct falls within the prohibitions of section 871. The Court of Appeals for the Third Circuit has not addressed section 871. Therefore, I must determine which interpretation of section 871 to apply in this case.

The government asserts that in order to show a violation of section 871, it must demonstrate beyond a reasonable doubt that the defendant intentionally made a statement that a reasonable person under the circumstances would interpret as a serious expression of intent to harm the Presi-

dent. Kosma argues that I should require the government to demonstrate that he made the alleged threat with specific intent to execute it. For the reasons that follow, I adopt the government's interpretation of section 871.

Kosma asserts that I should adopt the interpretation of Judge Wright writing in dissent in *Watts v. United States*, 402 F.2d 676 (1968), *rev'd*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (*per curiam*). Judge Wright proposed the following construction of section 871:

> Where an alleged threat which involves the communication of ideas is thought to "coerce or restrain" the President in the performance of his duties, a conviction under Section 871 can be sustained if (1) the defendant made the alleged threat with specific intent to execute it, *and* (2) in the context and circumstances the statement unambiguously constituted a threat upon the life or safety of the President.

*Id.*, at 692 (emphasis in original).

Since Judge Wright's dissenting opinion in *Watts*, only one Court of Appeals has held that in a section 871 case the government must show that the defendant intended to carry out his threat. *United States v. Patillo*, 438 F.2d 13, 15 (4th Cir.1971) (*en banc*) ("We think that an essential element of guilt [under section 871] is a present intention either to injure the President, or to incite others to injure him, or to restrict his movements. . . ."). The significant weight of authority has declined expressly

---

**4.** In *United States v. Hoffman*, 806 F.2d 703 (7th Cir.1986), *cert. denied*, 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987), the Court took into consideration the reaction of a White House mail room employee to an allegedly threatening letter. The Court noted: "The immediate response of the mail-room employee and the Secret Service to the content of [the defendant]'s letter is clear evidence of the seriousness the recipients of the letter attached to the expression of the intent to harm the President." *Id.*, at 712.

Writing in dissent in *Hoffman*, Senior Judge Will disagreed with the majority's reliance on the reaction of the mail room employee and the Secret Service. Judge Will argued that the majority misread *Watts*, which considered the response of listeners in determining the context in

which the defendant's statements were made and inferred that the defendant was engaged in political hyperbole. *Id.*, at 720. According to Judge Will,

> By contrast, no inference can be drawn from the reaction of a White House mail room employee or the members of the Secret Service, who are trained to react and to investigate with suspicion anything possibly suspicious, something that may be completely innocuous and harmless, such as a gift package sent to the White House.

*Id.* I agree with Judge Will's reading of *Watts*, and therefore have not taken into consideration the reaction of the White House staff and Secret Service to the alleged threats in determining whether Kosma's statements constitute "true threats".

to follow the *Patillo* Court's analysis. *See, e.g., Roy v. United States,* 416 F.2d 874, 878 n. 15 (9th Cir.1969); *United States v. Compton,* 428 F.2d 18, 21 (2nd Cir.1970), *cert. denied,* 401 U.S. 1014, 91 S.Ct. 1259, 28 L.Ed.2d 551 (1971); *United States v. Hart,* 457 F.2d 1087 (10th Cir.), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972); *United States v. Lincoln,* 462 F.2d 1368, 1369 (6th Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972); *United States v. Rogers,* 488 F.2d 512, 514 (5th Cir.1974), *rev'd on other grounds,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v. Kirk,* 528 F.2d 1057, 1063–64 (5th Cir.1976); *United States v. Merrill,* 746 F.2d 458, 462 (9th Cir.1984), *cert. denied,* 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985). A number of other courts by implication have declined to follow the *Patillo* analysis. *See, e.g., United States v. Vincent,* 681 F.2d 462, 464 (6th Cir.1982); *United States v. Callahan,* 702 F.2d 964, 965 (11th Cir. 1983); *United States v. Carrier,* 708 F.2d 77, 79 (2d Cir.1983); *Howell,* 719 F.2d at 1260; *Hoffman,* 806 F.2d at 711–12; *United States v. Glover,* 846 F.2d 339, 343–44 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988).[5]

In *Roy,* the Court explained the rationale which led it to reject the actual intent analysis:

... [I]t appears that [section 871] was designed in part to prevent an evil other than assaults upon the President. It is our view that the other evil is the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President's life.

\* \* \* \* \* \*

If a threat is made in a context or under such circumstances wherein it appears that it is a serious threat, and the President or his advisers are made aware of the existence of the threat, then the threat would tend to have a restrictive effect upon the free exercise of Presidential responsibilities, regardless of whether there is any actual danger to the President. Thus, even though the maker

of the threat does not have an actual intention to assault the President, an apparently serious threat may cause the mischief or evil toward which the statute was in part directed.

*Roy,* 416 F.2d at 877. *Accord, Compton,* 428 F.2d at 21; *United States v. Carvin,* 555 F.2d 1303, 1305 (5th Cir.), *cert. denied,* 434 U.S. 971, 98 S.Ct. 523, 54 L.Ed.2d 461 (1977). *See also United States v. Jim,* 865 F.2d 211, 214 (9th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 93, 107 L.Ed.2d 58 (1989) (applying 18 U.S.C. § 111). I find this rationale persuasive and will follow the significant weight of authority and hold that under section 871 the government is not required to prove that the defendant had the actual intent to carry out the alleged threat.

■ Having determined that the government need not prove actual intent, the *Roy* Court adopted a reasonable person test under section 871:

This Court therefore construes the willfulness requirement of the statute to require only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict serious bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress or coercion. The statute does not require that the defendant actually intend to carry out the threat.

*Roy,* 416 F.2d at 877. The Court of Appeals for the Ninth Circuit has reaffirmed the *Roy* Court's adoption of the reasonable person standard. *See Mitchell,* 812 F.2d at 1255; *Merrill,* 746 F.2d at 462. *See also United States v. Orozco–Santillan,* 903 F.2d 1262, 1265 (9th Cir.1990) (applying 18 U.S.C. § 115(a)(1)(B)). The government proposes that I adopt this test.

The Courts of Appeals for the Sixth, Seventh and Eleventh Circuits also have

---

**5.** *See also Hoffman,* 806 F.2d at 719 n. 3 (Will, S.J., dissenting).

adopted the reasonable person analysis under section 871. *See Glover*, 846 F.2d at 343–44 (citing *Vincent*, 681 F.2d at 464) (Court of Appeals for the Sixth Circuit holds that test is whether "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm or to take the life of the President.") (emphasis omitted); *Callahan*, 702 F.2d at 965 (Court of Appeals for the Eleventh Circuit holds that test is "whether there was sufficient evidence to prove beyond a reasonable doubt that the defendant intentionally made the statement under such circumstances that a reasonable person would construe [it] as a serious expression of an intention to do harm upon or to take the life of the persons named in the statute."); *Hoffman*, 806 F.2d at 711–12 (Court of Appeals for the Seventh Circuit approves jury instruction that jury could not convict under section 871 unless "convinced beyond a reasonable doubt that the defendant intentionally made the written statement ... in a context and under such circumstances that a reasonable person would foresee that the statement would be interpreted by persons hearing it as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States.").[6] *See also United States v. Khorrami*, 895 F.2d 1186, 1192–93 (7th Cir.1990) (applying 18 U.S.C. § 876).

I will follow the Courts of Appeals for the Sixth, Seventh, Ninth and Eleventh Circuits and adopt the objective standard.[7] Applying this test as the trier of fact, I conclude that a reasonable person would construe the statements charged in Counts one and two of the superseding indictment as serious expressions of an intention to do harm upon or to take the life of the persons named in the statute.[8] Therefore, I will find Kosma guilty on counts one and two of the superseding indictment.[9]

6. Kosma argues that I should decline to adopt the objective test because the test does not consider free speech concerns. However, as noted above, in my opinion the section 871 analysis requires a determination of whether the speech in question is protected under the First Amendment prior to an analysis of the elements of section 871. Having concluded that Kosma's statements are true threats and are therefore not subject to the protections of the First Amendment, I now apply the objective test to determine whether Kosma's speech violate section 871.

7. Citing *Howell*, Kosma asserts that the Court of Appeals for the Fifth Circuit requires the government to demonstrate that the defendant understood the meaning of the words uttered. In *Howell*, the Court reviewed the elements of a prosecution under section 871:

> It was incumbent upon the United States to prove beyond a reasonable doubt that (1) the threat was a true threat, and (2) that it was knowingly and intelligently made.... *A threat is knowingly made if the maker comprehends the meaning of the words uttered;* it is willfully made if the maker voluntarily and intelligently utters the words with an apparent intention to carry out the threat.

*Howell*, 719 F.2d at 1260 (emphasis added). Kosma contends that I should adopt the emphasized portion of the *Howell* Court's formulation as part of the government's burden under section 871.

Because the courts which have adopted the reasonable person standard have not included the *Howell* Court's definition of "knowingly" as part of the test, I decline to adopt it here. However, if I were to adopt the *Howell* formulation, it would not change the result in this case. If I were to adopt the *Howell* Court's formulation, I would deny the government's motion *in limine* and consider Dr. Natale's testimony on this issue. I would conclude as the trier of fact that Dr. Natale's testimony establishes beyond a reasonable doubt that Kosma understood both the meaning of the words he used in his statements and the concept of threat. *See* discussion, *supra*, at 1395, 1396. Therefore, the government has established Kosma's guilt under both the reasonable person test and the *Howell* Court's modification of that test.

8. Kosma candidly admits in his Memorandum that "government exhibits 1, 2 and 3, though in large part vituperative expressions of disdain for President Reagan, do contain statements that *could* be, if not would be, interpreted by a reasonable person as 'a serious expression of an intention to inflict bodily harm upon ... the President.'" Defendant's Memorandum of law, at 26–27 (citing *Mitchell*, 812 F.2d at 1255) (emphasis in original).

9. As Kosma concedes, because I have adopted an objective test under section 871, Dr. Natale's testimony as to counts one and two of the superseding indictment is irrelevant. Defendant's Memorandum of law, at 26. Therefore, I will grant the government's motion *in limine*.

C. The Elements of 18 U.S.C. § 879.

Count three of the Indictment charges Kosma with a violation of 18 U.S.C. § 879. That section provides, in pertinent part,

(a) Whoever knowingly and willfully threatens to kill, ..., or inflict bodily injury upon—

(1) a former President ... who is protected by the Secret Service as provided by law, shall be fined not more than $1,000 or imprisoned not more than three years, or both.

18 U.S.C. § 879(a).

While neither Kosma nor the government have cited any case construing section 879, the Report of the House Judiciary Committee which accompanied H.R. 6168 (codified at 18 U.S.C. § 879) includes a discussion of the Committee's intended interpretation of the "knowingly and willfully" language of section 879:

The Committee is aware that the term "knowingly and willfully" as used in section 871 has not been uniformly construed by the courts. Some courts have broadly construed the term, in accord with the explicit purpose of the legislation to prevent interference with the conduct of Presidential duties, and have not required evidence of intent to carry out the threatened act. Other courts have enunciated their concern that an overly broad interpretation of this term could in effect punish speech protected by the First Amendment. One court has required evidence of an individual's intent to carry out the threatened act.

With regard to section 879, the Committee recognizes the need to protect the safety of protectees of the Secret Service and their ability to function free of fear. Moreover, the Committee recognizes the

fundamental interests shared by all Americans in free and uninhibited speech, especially where public figures are concerned. Therefore, *the Committee construes a threat that is "knowingly and willfully" made as one which the maker intends to be perceived as a threat regardless of whether he or she intends to carry it out. A prosecution under this section would not only require proof that the statement could reasonably be perceived as a threat, but would also require some evidence that the maker intended the statement to be a threat.*

Objective circumstances would bear upon the proof of both subjective intent and objective perceptions. For example, if a person were serving a term of life imprisonment without the possibility of parole and therefore objectively could not be perceived as presently able to effect a threat to kill a protectee next week, this circumstance should bear upon whether a communication by the person would be considered as "knowingly and willfully" made. In other words, objective circumstances can bear upon the question of subjective intent, as in a situation where a threatened act would be patently infeasible.

H.Rep. No. 725, 97th Congress, 2d Session 3–4, *reprinted in* 1982 U.S.Code Cong. & Admin.News 2624, 2625–26 (footnotes omitted) (emphasis added).[10]

The government agrees that the Committee's Report requires the government to demonstrate by a preponderance of the evidence that the charged statement could reasonably be perceived as a threat, and that the defendant intended the statement to be a threat.[11] Government's trial memo-

---

**10.** The House Committee apparently adopted the test Justice Marshall proposed for section 871 in his concurring opinion in *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). In *Rogers* Justice Marshall, joined by Justice Douglas, suggested that the reasonable person test is incorrect. *Id.,* at 44, 95 S.Ct. at 2097. He stated:

Because § 871 was intended to prevent not simply attempts on the President's life, but also the harm associated with the threat itself, I believe that the statute should be construed

to proscribe all threats that the speaker intends to be interpreted as expressions of an intent to kill or injure the President. This construction requires proof that the defendant intended to make a threatening statement and that the statement he made was in fact threatening in nature.

*Id.,* at 47, 95 S.Ct. at 2098.

**11.** This is a greater burden than that which the *Howell* Court imposed. *See, supra,* n. 7. While the *Howell* Court required the government to

randum, at 3. The government also concedes that Dr. Natale's testimony is relevant to the consideration of Kosma's alleged violation of section 879. Government's motion *in limine*, at 3. Such testimony is admissible to negate mens rea. *See United States v. Pohlot*, 827 F.2d 889, 895–903 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988).

██ As the trier of fact, I conclude that the government has met the first portion of its burden. I find that the statement "21 guns are going to blow holes in your heart and brains. You should pick an honorable way to die." could reasonably be perceived as a threat. However, I find the issue of whether the government has demonstrated beyond a reasonable doubt that Kosma intended his statement to be a threat more difficult.

██ First, I consider important the fact that Kosma was incarcerated at the time he sent the letter which forms the basis of count three. While his incarceration was not of the magnitude of a "term of life imprisonment without parole" mentioned in the House Report, it demonstrates at least that the act which Kosma threatened was infeasible in the short term.

Second, I consider the import of Dr. Natale's testimony on whether Kosma intended his statement to be a threat. During the course of his testimony, Dr. Natale stated that Kosma was able to communicate with no clear disturbances of speech and language and that his sentences were coherent and responsive. Dr. Natale also stated that in his opinion Kosma understood the content of certain words included in the government's exhibits, and that Kosma had the capacity to understand the concept of threat. *See* discussion, *supra*, at 1395–1397. From this testimony, I conclude that Kosma understood both the meaning of the statement underlying count three and the concept of threat.

The government argues that the following excerpt from Dr. Natale's testimony establishes beyond a reasonable doubt that Kosma intended his statement to be a threat:

Q: So far as you're able to tell, sir, with regard to his particular fixation and compulsion, ... to the extent he gives into [sic] it, would it appear to be satisfied by actually making a written communication ... or would it possibly lead to additional activities on his part?

A: It is my perception that most of his emotional investment is in the act of communication, okay, that he [has] in all likelihood not organized a plan or a series of ideas on the carrying out of his specific threat. *It seems as if the actual letter and the content of the letter would be read and the thought that the letter would be read and understood, that that constitutes the threat in his mind.*

N.T. 20–21 (emphasis added).

Dr. Natale's testimony establishes that Kosma understood the meaning of his words and the concept of threat. However, weighing Dr. Natale's testimony concerning Kosma's mental state and considering the fact of Kosma's incarceration, I cannot conclude that the government has demonstrated beyond a reasonable doubt that Kosma intended his statement to be a threat. Therefore, I will acquit Kosma on count three.

## IV. *Conclusion.*

For the foregoing reasons, I find Kosma guilty on counts one and two of the superseding indictment. I find Kosma not guilty on count three of the superseding indictment.

---

prove only that the defendant understood the meaning of the words he used, the House Report requires the government to prove that the defendant intended his words to be a threat. Thus, although Dr. Natale's testimony establish-

es that Kosma understood the meaning of his words beyond a reasonable doubt, I cannot conclude that Dr. Natale's testimony establishes that Kosma also intended the words to be a threat.