**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gregory Stuart GORDON,
Defendant–Appellant.**

**No. 91–50281.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 1992.

Decided Sept. 4, 1992.

Andrew French Loomis, Oakland, Cal., for defendant-appellant.

Robert R. Calo, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before: SNEED and D.W. NELSON, Circuit Judges, and ROLL *, District Judge.

SNEED, Circuit Judge:

Gregory Stuart Gordon was convicted in a jury trial of making threats against a former President in violation of 18 U.S.C. § 879(a)(1).[1] He appeals, challenging the sufficiency of the evidence as well as the district court's denial of four pretrial motions. We affirm.

### I.

### FACTS AND PROCEEDINGS BELOW

#### A. *Facts*

On July 4, 1990, at approximately 3:30 p.m., Mr. Gordon climbed over a wall and entered the property of former President Ronald Reagan in Bel Air, California. He entered the house through the front door and passed through the foyer. As Mr. Gordon exited to the backyard, he was apprehended by Secret Service Special Officer Ricafrente. Ricafrente placed Mr. Gordon against a wall in the backyard, and, with his weapon drawn on Mr. Gordon, called for assistance.

Agents Bodigheimer and Yarosh arrived, and the three agents walked Mr. Gordon back to the driveway in front of the house. As they placed him in a prone position on the ground, Mr. Gordon said, "Ronald Reagan is the anti-Christ; he must be killed and I must kill him." Agents Greenaway and O'Donnell arrived. While the agents moved Mr. Gordon to a shaded area, he repeated, "Ronald Reagan is the anti-Christ; he must be killed and I must kill him." Greenaway advised Mr. Gordon of his *Miranda* rights and asked him if he understood those rights. Mr. Gordon replied, "Yeah, I understand my rights." He then said, "Ronald Reagan is the anti-Christ. I am here to kill President Reagan."

Greenaway and Yarosh conversed with Mr. Gordon. Yarosh testified that Mr. Gordon knew where he was, and that he appeared to be coherent. During the conversation, Mr. Gordon said the following:

— "I've been trying to kill President Reagan for ten years."
— "It doesn't matter if I die. Ronald Reagan is the anti-Christ. I must kill the anti-Christ."
— "I jumped the wall because I wanted to kill President Reagan."
— "I'll be back. As soon as I get out, I'll be back."

He also asked if the Reagans were at home and if the event would be on the news. He informed the agents that he had been taking medication, but had stopped two months earlier.

Mr. Gordon was then taken to the Los Angeles Police Department, where he was

---

* Honorable John M. Roll, United States District Judge for the District of Arizona, sitting by designation.

1. Section 879(a) provides for the punishment of anyone who "knowingly and willfully threatens to kill, kidnap, or inflict bodily harm upon (1) a former President ... who is protected by the Secret Service as provided by law...."

interviewed by Secret Service Special Agent Proctor, who had met Mr. Gordon on a prior occasion. Proctor read Mr. Gordon his *Miranda* rights and asked him if he understood those rights. Mr. Gordon said yes, and agreed to talk with Proctor (although he refused to sign a written waiver). Mr. Gordon told Proctor that Ronald Reagan is the anti-Christ based on the 666 calculation in the Book of Revelations, and that he is the second coming of Christ charged with the responsibility of eliminating the anti-Christ. He said he had gone to the Reagan residence because he wanted to strangle Ronald Reagan. Later in the interview, Mr. Gordon said that if he were able to have a private conversation with Ronald Reagan, he would shake Mr. Reagan's hand and tell him to help the homeless.

Mr. Gordon informed Proctor that earlier in the day, he had tried to gain admittance to the USC–LA County Medical Center, and had told a member of the medical staff that if he were not admitted, he would kill Ronald Reagan. He said that the doctors told him he was sane and gave him some money for food, which he used for bus fare to Bel Air. Staff at the Medical Center later confirmed this conversation.

B. *Proceedings Below*

The district court denied Mr. Gordon's pretrial motions to recuse Judge Rafeedie, to dismiss the indictment because it charges him with violating an unconstitutional statute, to suppress statements he made while in custody, and to discover all documents in the possession of the Secret Service related to that agency's prior contact with and investigation of Mr. Gordon. On March 6, 1991, the jury returned a verdict of guilty on the indictment charging Mr. Gordon with a violation of 18 U.S.C. § 879(a)(1). Mr. Gordon appeals these pretrial rulings, as well as the sufficiency of the evidence to support a conviction.

## II.

### JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We apply an abuse of discretion standard when reviewing denials of motions for recusal and discovery. *United States v. Studley*, 783 F.2d 934, 939 (9th Cir.1986); *United States v. Michaels*, 796 F.2d 1112, 1115 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). We review a statute's constitutionality and a motion to suppress evidence de novo. *United States v. Van Hawkins*, 899 F.2d 852, 853 (9th Cir.1990); *United States v. Mitchell*, 812 F.2d 1250, 1253 (9th Cir. 1987). Whether a statement was taken in violation of *Miranda* rights is "reviewed de novo as a mixed question of law and fact, while the district court's factual findings are reviewed for clear error." *United States v. Hunt*, 893 F.2d 1028, 1032 (9th Cir.1990), *modified on other grounds*, 925 F.2d 1181 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 107, 116 L.Ed.2d 77 (1991). Whether a statement is voluntary is a legal question which we review de novo. Voluntariness must be established by a preponderance of the evidence. *United States v. Kelley*, 953 F.2d 562, 564 (9th Cir.1992). When reviewing the sufficiency of the evidence to support a conviction, we determine whether viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Mitchell*, 812 F.2d at 1255.

## III.

### DISCUSSION

A. *The Motion for Recusal*

Mr. Gordon contends that his motion for recusal should have been granted because Judge Rafeedie was appointed to the bench by President Reagan, the victim and a potential witness. It is not reasonable to suspect that Judge Rafeedie's ability to preside impartially would be affected by the fact that President Reagan appointed him. *See* 28 U.S.C. § 455(a); *Studley*, 783 F.2d at 939. The district court did not abuse its discretion in denying Mr. Gordon's motion for recusal.

---

### B. *The Constitutional Challenge to 18 U.S.C. § 879(a)(1)*

Mr. Gordon moved to dismiss the indictment on the grounds that section 879(a)(1) violates the Tenth Amendment and the equal protection principle embodied in the due process clause of the Fifth Amendment.

#### 1. Tenth Amendment

Mr. Gordon's argument that the Tenth Amendment reserves for the states the authority to punish an individual for threatening the life of a former President is without merit. The Supreme Court recently noted that "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, — U.S. —, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992). Congress exercised legitimate power when it enacted section 879(a)(1). A statute, even one imposing penalties, that aids the federal government in protecting the Commander in Chief of the armed forces after he leaves office can reasonably be considered necessary and proper in order to provide for the common defense and general welfare. *See* U.S. Const. art. I, § 8; *United States v. Von Stephens*, 774 F.2d 1411, 1413 (9th Cir.1985). This statute aids in protecting former Presidents by allowing the Secret Service to respond more effectively to threats against them.[2]

#### 2. Equal Protection

Mr. Gordon's fifth amendment argument is equally unavailing. To challenge the statute on equal protection grounds, Mr. Gordon must show that it does not rationally further legitimate state ends. *Burlington N. R.R. v. Ford*, — U.S. —, 112 S.Ct. 2184, 2186, 119 L.Ed.2d 432 (1992). Presidents occupy a unique position, resulting from both their access to confidential information and their exposure to the public, that makes them likely targets for potential kidnappers or assassins. Congress therefore had a rational basis for prohibiting threats against former Presidents but not threats against other former federal officials.[3]

### C. *The Motion to Suppress Statements*

#### 1. The district court's ruling

The trial transcript reveals that the district court admitted incriminating statements that Mr. Gordon made both after he was arrested and before the Secret Service agents advised him of his *Miranda* rights, and after he received an appropriate *Miranda* warning and indicated that he understood his rights. The trial transcript also indicates that the statements Mr. Gordon made prior to his *Miranda* warnings were spontaneous and not in response to questioning by the agents. Mr. Gordon asserts that his statements made both before and after he received his *Miranda* warning should have been suppressed. The district court determined that Mr. Gordon received a proper *Miranda* warning and that he voluntarily and intelligently waived his rights. Accordingly, the district court concluded that all statements Mr. Gordon made after he waived his *Miranda* rights were admissible. It also ruled that all statements Mr. Gordon made before he received a *Miranda* warning that were not in response to any questions posed by the agents were admissible as spontaneous statements that were not the product of custodial interrogation. As an additional basis for admitting Mr. Gordon's statements, the district court noted that they fell under *United States v. Mitchell*, 812 F.2d 1250 (9th Cir.1987), because they constituted crimes in themselves.

---

[2] The legislative history describes the need for this statute: "Currently, Secret Service investigations and the prosecution of persons who make threats against protectees are hampered by reliance on various State laws. The bill as amended will meet these needs." 128 Cong.Rec. 21,218 (1982).

[3] Mr. Gordon's contention that the statute is overbroad in forbidding personal threats along with those implicating national security fares no better. The Secret Service would be ineffective in safeguarding federal interests if it were forced to distinguish between personal and political threats to former Presidents before reacting to those threats.

2. Mitchell analysis: The exclusionary rule does not apply to statements that are themselves crimes

Our decision in *Mitchell* supports the admission of all of Mr. Gordon's incriminating statements covered by the indictment. Applying the exclusionary rule to these statements is inappropriate due to the nature of the crimes at issue. Section 879(a)(1) punishes threats against a former President. The statements Mr. Gordon seeks to suppress were not merely evidence of a crime, but also the crime itself. *Id.* at 1253. In this situation, whether Mr. Gordon received a *Miranda* warning is irrelevant. The purpose of the *Miranda* warning is to protect defendants by safeguarding their privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 498, 86 S.Ct. 1602, 1640, 16 L.Ed.2d 694 (1966). However, failure to give a *Miranda* warning does not bar prosecution of an offense committed while in custody. *Mitchell,* 812 F.2d at 1253.

3. Miranda analysis

In addition, the district court's ruling admitting statements Mr. Gordon made after he received a *Miranda* warning was justified by the record. The declarations of the Secret Service agents provide ample support for the finding that Mr. Gordon received a *Miranda* warning. Accordingly, that finding is not clearly erroneous. Furthermore, the facts establish by a preponderance of the evidence that Mr. Gordon knowingly and voluntarily waived his *Miranda* rights. We look to the totality of the circumstances surrounding the interrogation to determine if Mr. Gordon waived his *Miranda* rights. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986). The declarations of Special Agents Yarosh and Greenaway state that, after Mr. Gordon received a *Miranda* warning, he said "Yeah, I understand my rights," and immediately made incriminating statements. He then freely conversed with the agents. Special Agent Proctor's declaration states that after he advised Mr. Gordon of his *Miranda* rights, Mr. Gordon said he understood those rights and then agreed to talk to Proctor. Mr.

Gordon is a graduate of Rutgers College and attended law school at the University of California at Berkeley for a year. These facts are sufficient to establish by a preponderance of the evidence that Mr. Gordon knowingly and voluntarily waived his *Miranda* rights.

In addition, Mr. Gordon's statements that were made before he received a *Miranda* warning but not in response to any questions by the agents were admissible as "volunteered statements." *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1629.

D. *The Motion for Discovery*

Mr. Gordon also contends that the district court abused its discretion when it denied his motion for discovery of all documents in the possession of the Secret Service regarding that agency's prior contact with or investigation of him. Because Mr. Gordon did not show that the items requested were material to his defense, Fed. R.Crim.P. 16(a)(1)(C), we find that the district court acted within its discretion in ruling that these documents were not discoverable.

Mr. Gordon argues that the items in question are material to determining whether those hearing the statements would perceive them as serious threats. *See Roy v. United States,* 416 F.2d 874, 877–78 (9th Cir.1969). This argument rests upon two assumptions. First, Mr. Gordon assumes that the subjective knowledge of "those to whom the maker communicates the statement," *id.* at 477, is relevant. Second, he assumes that it is reasonable to suppose that the individual Secret Service agents who heard the statements possess the entire relevant knowledge of the Secret Service. Even if Mr. Gordon is correct in believing that the subjective knowledge of those who heard his statements is relevant, the district court, which viewed the requested material *in camera,* stated that none of the agents present at the Reagan residence had any prior contact with, or possessed knowledge of, Mr. Gordon. Moreover, the district court did not abuse its discretion when it rejected Mr. Gordon's

second assumption. The information the Secret Service possessed regarding Mr. Gordon should not be attributed to the agents present at the Reagan residence. To do so would seriously frustrate the purpose of the statute in question.

## E. *The Sufficiency of the Evidence*

Section 879 is of relatively recent origin. Ascertaining the elements of that offense is a question of first impression for this court.[4] Because section 879 is closely analogous to 18 U.S.C. § 871, which prohibits threats against a sitting President, we look for guidance to cases interpreting that statute, as well as to the legislative history of section 879.

■■■■■ The requirements for proving a violation of section 871 are applicable to section 879 as well. The government was required to prove beyond a reasonable doubt that the defendant made a "true threat" against former President Reagan. *Mitchell*, 812 F.2d at 1255. In determining whether Mr. Gordon's statements constituted "true threats," the jury looks at the entire factual context of those statements including: the surrounding events, the listeners' reaction, and whether the words are conditional. *Id.* The jury decides whether the statement was made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the [former] President, and [whether] the statement [was] the result of mistake, duress, or coercion." *Roy*, 416 F.2d at 877–78. *See also Mitchell*, 812 F.2d at 1255; *United States v. Merrill*, 746 F.2d 458, 462 (9th Cir.1984), *cert. denied*, 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985).

■■■■■ In addition, because Congress "construe[d] 'knowingly and willfully' [in section 879] as requiring proof of a subjective intent to make a threat," 128 Cong. Rec. 21,218 (1982), the jury must find that Mr. Gordon intended the statements to be taken as threats.

> [A] threat that is "knowingly and willfully" made [is] one which the maker intends to be perceived as a threat regardless of whether he or she intends to carry it out. A prosecution under this section would not only require proof that the statement could reasonably be perceived as a threat, but would also require some evidence that the maker intended the statement to be a threat.

H.R.Rep. No. 725, 97th Cong., 2d Sess. 4 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2624, 2626. A reasonable jury could have found that the statements constituted "true threats."

Mr. Gordon's arguments to the contrary are inconsistent with this court's prior holdings regarding 28 U.S.C. § 871, as well as section 879's legislative history. He contends that he was at the Reagan residence not to harm the former President, but rather to garner publicity for his religious beliefs and to gain admission to a hospital. This argument misconstrues the nature of the violation. The intent required is the intent to make a threat; the statute does not require the actual intent to inflict harm.

Although some of the factual circumstances surrounding the incident suggest a contrary result, the jury acted reasonably when it (1) interpreted Mr. Gordon's statements as an indication of intended future conduct rather than merely an explanation of past conduct, and (2) when it concluded that the threats were serious despite Mr. Gordon's nonthreatening and contradictory comments. *See Mitchell*, 812 F.2d at 1256.

■■■■■ Moreover, the statements can be considered "true threats" even though Mr. Gordon was in custody and unarmed when he made them. While a speaker's present inability to carry out a threat is

---

4. We have found only one other case that addresses the elements of section 879. *See United States v. Kosma*, 749 F.Supp. 1392 (E.D.Pa. 1990), *aff'd*, 951 F.2d 549 (3d Cir.1991).

relevant to the jury's consideration of whether that person possessed the requisite subjective intent,[5] the circumstances of this case, viewed in the light most favorable to the government, support the jury's finding that Mr. Gordon intended his statements to be a threat.[6] Mr. Gordon had managed to enter former President Reagan's home before being apprehended. Once in custody, he stated, among other things, "Ronald Reagan is the anti-Christ. He must be killed and I must kill him." Furthermore, he told the agents present that he had been trying to get Reagan for ten years, and that he would be back. The Secret Service agents present testified that Mr. Gordon appeared coherent and his demeanor was serious. Under these circumstances, a reasonable jury could find that the statements were "true threats," and that Mr. Gordon violated section 879.

### IV.

### CONCLUSION

In sum, we hold that the district court properly denied Mr. Gordon's motions to recuse Judge Rafeedie, to dismiss the indictment, to suppress Mr. Gordon's statements, and to discover Secret Service documents. Furthermore, we hold that the evidence was sufficient to support Mr. Gor-

don's conviction. The judgment of the district court is affirmed.

**AFFIRMED.**

---

5. The legislative history of section 879 notes that objective circumstances are relevant in determining whether the speaker made a true threat:

   Objective circumstances would bear upon the proof of both subjective intent and objective perceptions. For example, if a person were serving a term of life imprisonment without the possibility of parole and therefore objectively could not be perceived as presently able to effect a threat to kill a protectee next week, this circumstance should bear upon whether a communication by the person would be considered as "knowingly and willfully" made. In other words, objective circumstances can bear upon the question of subjective intent, as in a situation where a threatened act would be patently infeasible.

   H.R.Rep. No. 725, 97th Cong., 2d Sess. 4 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2624, 2626 (citations omitted). This is consistent with section 871 cases noting that the jury must consider the entire factual context. *See Watts v. United*

*States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam); *Mitchell,* 812 F.2d at 1255; *Merrill,* 746 F.2d at 462.

6. The district court decision in *United States v. Kosma,* 749 F.Supp. 1392 (E.D.Pa.1990), *aff'd,* 951 F.2d 549 (3d Cir.1991), acquitting the defendant of violating section 879 is not to the contrary. In that case, the district court, sitting as trier of fact, determined that the government had not demonstrated beyond a reasonable doubt that the defendant intended his statement to be a threat. It considered the testimony of an examining psychiatrist as well as the fact that the defendant was incarcerated when he mailed the threatening letter. Contrary to Mr. Gordon's assertion, that case does not stand for the proposition that when a threatened act is "infeasible in the short term," 749 F.Supp. at 1402, the speaker lacked the requisite subjective intent as a matter of law.