**UNITED STATES**

v.

**Maurice RICHARDS**

**No. CRIM.A. 05–CR–0151.**

United States District Court, E.D. Pennsylvania.

Nov. 18, 2005.

Manisha M. Sheth, U.S. Attorney's Office, Philadelphia, PA, for United States.

Elizabeth T. Hey, Federal Defenders, Philadelphia, PA, for Maurice Richards.

### *MEMORANDUM*

SURRICK, District Judge.

Defendant Maurice Richards is charged with one count of knowingly and willfully threatening to kill and inflict bodily harm upon Senator Hillary Rodham Clinton, the wife of former President William Jefferson

Clinton, in violation of 18 U.S.C. § 879(a)(1). (Indictment, Doc. No. 14.)

## I. FINDINGS OF FACT

On January 24, 2005, Defendant was at Our Brother's Place homeless shelter, located at 907 Hamilton Street in Philadelphia. (Nov. 7, 2005 Trial Tr. at 25:21–26:10.) At approximately 5:00 p.m. that day, Defendant was waiting in line at the shelter, along with other "walk-ins," for dinner. (*Id.*) From his office near the dinner line, Marc Miller, a counselor at the shelter, observed Defendant repeatedly speak into his Walkman radio and then hold it to his ear. (*Id.*) Miller heard Defendant say, "I'm gonna put two bullets into her, gonna put two bullets into Hillary Clinton."[1] (*Id.* at 26:13–16.) Defendant's statement was loud enough so that Miller heard the statements from his office over the voices of the other approximately thirty individuals waiting in the meal line. (*Id.* at 29:18–30:6.) When Miller came out of his office, he noticed that when Defendant could see him, Defendant stopped making the statements, but would resume making the statements when Miller was out of his line of sight. (*Id.* at 31:7–18.) Miller did not hear any sound coming from Defendant's radio. (*Id.* at 31:19–21.) Miller approached Defendant and asked him if he would like to accompany Miller into his office to talk. (*Id.* at 33:16–35:12.) Defendant refused, stating, "I'm fine, I'm fine, I'll stop." (*Id.* at 33:7–11.) The other individuals standing in the meal line looked uneasy, and some looked away from Defendant while others moved away from him. (*Id.* at 32:6–10, 74:22–75:3, 92:5–13.)

Miller then sought out Alexandra Blitman, a mental health clinician at the shelter, because he thought that Defendant might have some mental health issues. (*Id.* at 35:14–36:18.) As Miller walked to Blitman's office, Miller heard Defendant repeat the phrase, "I'm gonna put two bullets into Senator Clinton." (*Id.* at 39:15–21.) After speaking with Blitman, Miller returned to his office but kept his door open and stood near the door. (*Id.* at 40:10–20.) When Blitman approached Defendant, he said to her, "Get the fuck away from me, white girl."[2] (*Id.* at 98:1–20.) Miller observed Defendant gesturing towards Blitman "in a hostile manner." (Trial Ex. G–3.) As Blitman walked away from Defendant, she heard Defendant say, "Take three bullets and put them in Hillary Clinton." (Trial Tr. at 98:1–20.) Defendant also said, "I'm going to kill that white woman devil." (Trial Ex. G–2.)

Miller notified the building's security that there was a "potential issue" with Defendant. (*Id.* at 43:21–44:20.) He also discussed the situation with the shelter supervisor, Fred Purdie. (*Id.* at 44:22–45:10.) Miller thought that Purdie, an African–American, might have "better luck" than he and Blitman had in speaking with Defendant. (*Id.*) Purdie brought Defendant to the day room office at the shelter, where Miller was waiting. (*Id.* at 48:2–4.) Defendant was angry. (*Id.* at 115:24–116:1.) At this point, Miller was turning red and looked afraid. (*Id.* at 116:7–14.) In the office, Miller attempted to speak to Defendant. Defendant became defensive and told Miller that he did not want to speak with white people. (*Id.* at 49:4–12.) Defendant was agitated and made statements such as "I hate white people," and "screamed about cutting off white people's

---

1. Miller submitted a written statement to the Secret Service the day after the incident, in which he wrote that Defendant repeated the phrase, "I'm going to put two bullets into

Sen. Clinton." (Nov. 7, 2005 Trial. Tr. at 26:22–29:11; Trial Ex. G–2.)

2. Defendant is an African–American male.

heads." (*Id.* at 49:14–50:2[missing text] 51:1–6.) There was another staff member in the day room office by the name of Brian who was alarmed by Defendant's statements. (*Id.* at 51:12–23.)

The shelter's staff decided that Defendant could not stay at the shelter because of "the potential threat to himself or other people." (*Id.* at 52:5–19.) Miller believed that Defendant "could be a potential threat to himself or others if he stayed overnight." (*Id.* at 54:8–14.) Purdie did not want Defendant around the other guests at the shelter because he might lose control. (*Id.* at 119:9–120:3.) A decision was made to take Defendant to a crisis center. One of the reasons Miller favored putting Defendant in a crisis center—instead of allowing him to stay at the shelter—was the fact that Defendant was threatening to kill people. (*Id.* at 81:14–19.) Purdie contacted the police to assist with the involuntary commitment of Defendant. (*Id.* at 121:2–10.)

Two police officers arrived at the shelter to escort Defendant to a crisis center. (*Id.* at 55:19–56:14.) Defendant "backed up" when the police came near him. (*Id.* 123:1–18.) He told the police to "get the fuck off me" and "don't touch me, you're going to break my arms." *Id.* After Defendant was handcuffed by the police, he accused the police of police brutality. (*Id.* 55:19–56:14.) He also screamed that he hated white people and "kill the white bitch devil." (*Id.*) Defendant was taken by the police to Hall Mercer Clinic at Pennsylvania Hospital. (*Id.* at 57:16–58:5.) At Hall Mercer, Miller applied to have Defendant involuntarily committed. (*Id.* at 60:23–61:12; Trial Ex. G–3.) While at Hall Mercer, Defendant continued to yell and scream that he hated white people and particularly Hillary Clinton. (Trial Tr. at 128:23–129:10.) He was perceived as "threatening" by an employee at Hall Mercer. (*Id.*)

Defendant was involuntarily committed until January 28, 2005. On January 28th, he was released from involuntary commitment and voluntarily re-entered the inpatient treatment program at Fairmount Behavioral Health. Senator Clinton was scheduled to visit Philadelphia on February 4, 2005. (Trial Ex. G–8.) Defendant was discharged from Fairmount on February 7, 2005, at which time he was arrested by the Secret Service on the instant charge. Defendant was indicted on March 16, 2005 for violating 18 U.S.C. § 879 by threatening to kill or inflict bodily harm on Senator Hillary Clinton, wife of the former President. On November 7, 2005, Defendant waived his right to a jury trial, and was tried non-jury.

## II. DISCUSSION

### A. True threats

■ Defendant is charged with violating § 879, which provides in pertinent part: Whoever knowingly and willfully threatens to kill, kidnap, or inflict bodily harm upon ... (1) a former President or a member of the immediate family of a former President ... shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 879 (2005). In order to establish Defendant's guilt in this matter, the Government must first establish that the threats made by Defendant were "true threats." True threats are not protected political speech under the First Amendment. *United States v. Kosma*, 951 F.2d 549, 553 (3d Cir.1991). In the case of *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court examined the difference between true threats and protected speech in the context of 18 U.S.C. § 871, a statute

with language very similar to the language of § 879. Section 871 provides in pertinent part:

> Whoever knowingly and willfully ... makes any such threat [to take the life of, to kidnap, or to inflict bodily harm] against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 871 (2005). The *Watts* Court declared that § 871's prohibition on threats was a constitutionally valid limitation on the First Amendment as long as the proscribed speech was limited to "true threats," as distinguished from constitutionally protected speech. *Watts,* 394 U.S. at 707–08, 89 S.Ct. 1399. In *Watts,* during a public rally on the Washington Monument grounds, Watts had stated: "I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Watts,* 394 U.S. at 706, 89 S.Ct. 1399. The Supreme Court determined that because the statement was made in the context of a political rally, because it was conditional in nature, and because the audience reacted by laughing, Watts's statements constituted protected speech. *Id.* at 707–08, 89 S.Ct. 1399. The Supreme Court recognized the necessity, and therefore the constitutionality, of a law that prohibits threats against the President: "The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." *Id.* at 707, 89 S.Ct. 1399. Because § 871 makes a form of pure speech criminal, the Court explained that it must interpret the law "with the commands of the

First Amendment clearly in mind," meaning that it must distinguish a "true threat" from constitutionally protected speech. *Id.* While the Court in *Watts* did not define a "true threat," it distinguished a true threat from Watts's constitutionally protected "political hyperbole," which was merely a "very crude offensive method of stating a political opposition to the President." *Id.* at 708, 89 S.Ct. 1399. The Court determined that, "[t]he appropriateness of such statements ... must be viewed 'in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners.'" *Kosma,* 951 F.2d at 553–54 (quoting *Watts,* 394 U.S. at 708, 89 S.Ct. 1399); *see also United States v. Gordon,* 974 F.2d 1110, 1117 (9th Cir.1992) (in the analysis under § 879, in order to determine whether the statements are true threats, "the jury looks at the entire factual context of those statements including: the surrounding events, the listeners' reaction, and whether the words are conditional").

In this case, Defendant's statements were made in a homeless shelter while waiting in line for a meal. The statements were clearly not made in the context of a political rally or debate. *Cf. Watts,* 394 U.S. at 706, 89 S.Ct. 1399. Defendant contends that the "bizarre behavior" he exhibited when he made the statements at the shelter supports a finding that his statements are not true threats. (Def. Mot. and Post–Trial Mem., Doc. No. 51 at 5–6.) Defendant's mental health problems are evident. However, Defendant's mental health problems and the fact that his conduct was not particularly rational do not prevent his threats from being "true threats." Such a determination would run counter to the congressional purpose behind 18 U.S.C. § 879. As the Ninth Circuit has noted:

Although it is true that a series of bizarre remarks may tend to lower a person's credibility, potential assassins may well be irrational. Hence, to dismiss threats merely because a person expresses himself in an outlandish, illogical manner may defeat § 871's purpose of apprehending people who potentially pose a threat to the President.

*United States v. Mitchell,* 812 F.2d 1250, 1256 (9th Cir.1987) (affirming district court's denial of motion for acquittal because defendant's statements could constitute true threats despite the fact that defendant also claimed to be Mahatma Gandhi); *see also United States v. Miller,* 115 F.3d 361, 364 (6th Cir.1997) (the manifest instability and irrationality of the defendant predictably heightened the apprehension by the recipients of defendant's threats that the defendant could be sufficiently imbalanced to seek the realization of his proclamations). In addition, the statements made by Defendant regarding Senator Clinton were not conditional in any sense. Finally, in *Watts,* both the speaker and the audience laughed when the statements were made. *Watts,* 394 U.S. at 707, 89 S.Ct. 1399. In this case, the staff at the shelter and, with some exceptions, the people in the dinner line, did not consider Defendant's statements to be a laughing matter. When the staff members heard Defendant's statements, they became concerned and sought to remove him from the shelter. One staff member was alarmed by Defendant's statements and another was afraid. Individuals standing in the dinner line near Defendant looked uneasy when Defendant made these statements, and some moved away from him while others looked away. We are satisfied that the statements made by Defendant that he was going to shoot Senator Clinton were true threats. As such, they are not protected by the First Amendment.

## B. Elements of 18 U.S.C. § 879(a)(1)

The Government must prove beyond a reasonable doubt that Defendant "knowingly and willfully threaten[ed] to kill, kidnap, or inflict bodily harm upon ... a member of the immediate family of a former President."[3] 18 U.S.C. § 879(a)(1). The phrase "knowingly" requires proof that Defendant made the statement voluntarily and intentionally and did not communicate the threat as a result of mistake, duress, or coercion. *Kosma,* 951 F.2d at 558. The evidence here demonstrates that

---

**3.** In his Post–Trial Memorandum, Defendant argues that the Government did not prove that Defendant Maurice Richards is the person who committed the offense. (Doc. No. 51 at 2.) This argument is based on the failure of the Government to have the Defendant identified by a witness in court. Defendant's argument is without merit. The identification of Defendant Maurice Richards was not an issue in the case. The issue was always whether Maurice Richards "knowingly and willfully" made the threats on January 24, 2005 and whether those threats were "true threats," not whether he was the individual who made the threats. The testimony established that immediately after making the threats, Maurice Richards was taken by the police and was involuntarily committed for treatment. He was then transferred to voluntary commitment and was arrested by the Secret Service as he was being released from his voluntary commitment. He was evaluated by two psychiatrists who both interviewed him and who testified at trial concerning the threats that he admittedly made. The people who observed Defendant making the threats also testified at trial. Defendant identified himself as Maurice·Richards while under oath during the waiver of jury trial colloquy and signed the Waiver of Jury Trial form. Defendant has identified himself as the person who made the threats in his submissions to the Court. The record in this case establishes beyond a reasonable doubt that Defendant Maurice Richards is the individual who made the threats regarding Senator Clinton at Our Brother's Place on January 24, 2005, notwithstanding the Government's inadvertence.

while Defendant was making these threats he was approached by Miller. He told Miller, "I'm fine … I'll stop." When Miller left, Defendant resumed the threats. Whenever Miller was in Defendant's line of vision, Defendant would stop, only to begin again when he could not see Miller. There is no indication in the record that Defendant was making these threats as a result of mistake, duress, or coercion. There is more than sufficient evidence to establish that he was making the threats "knowingly," that is, voluntarily and intentionally.

■ The more difficult problem is the meaning of the word "willfully" in this statute. The parties disagree about the proof required to establish that Defendant's conduct was "willful." The Government contends that they need only prove that a reasonable person would perceive Defendant's statements as a threat, thus interpreting § 879 to be a general intent crime with an objective standard for "willfully." (Gov't Tr. Mem., Doc. No. 39 at 7.) Defendant argues, however, that § 879 requires that the Government demonstrate not only that a reasonable person would perceive Defendant's statements as a threat, but also that Defendant intended his statements to be a threat, thereby construing § 879 to be a specific intent crime requiring proof to satisfy both an objective standard and a subjective standard for "willfully." (Def. Tr. Mem., Doc. No. 34 at 19.) We have no binding authority on this issue. An examination of the legislative history of both § 879 and its sister statute § 871, as well as cases discussing the requisite intent for both statutes, is instructive.

The House Judiciary Committee Report that accompanied § 871 at the time of its passage in 1916 stated the purpose of this law as follows:

> This bill is designed to restrain and punish those who would threaten to take the life of, or inflict bodily harm upon, the President of this Republic. It is the first and highest duty of a Government to protect its governmental agencies, in the performance of their public services, from threats · of violence which would tend to coerce them or restrain them in the performance of their duties.

H. Rep. No. 64–652 (1916). Several cases have addressed the intent required for a conviction under § 871. The Third Circuit in *Kosma* adopted an objective, reasonable person test both for what it termed the "willful" and the "knowing" elements of § 871. In adopting this test, the Third Circuit followed the Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits. *Kosma*, 951 F.2d at 557. Since *Kosma*, this standard has also been adopted by the First and Second Circuits. In *Kosma*, the court stated that the objective standard for "willfully" requires that

> the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress, or coercion. The statute does not require that the defendant actually intend to carry out the threat.

*Kosma*, 951 F.2d at 557 (emphasis omitted). The *Kosma* court discussed two reasons for rejecting a subjective test that requires that the speaker either intend to carry out the threat or intend for his statement to be taken as a threat. *Id.* at 556. First, the court indicated that the subjective test hinders the government's ability to prosecute threats against the President,

seriously compromising the safety of the President.[4] *Id.* While in some contexts such a test would be "tolerable," the Court explained that the President's safety was a "compelling, and indeed paramount" interest that the sponsors of the bill recognized. *Id.* (quoting one of the bill's sponsors: "the Chief Executive of a great Nation like ours ought to be protected in every way possible, especially in view of the sad experience we had in losing by assassination three of our beloved Presidents." 53 Cong. Rec. 9378 (1916)). Second, the Court determined that the subjective test thwarted the purpose of the law, which was not only to protect the life of the President, but to prevent the disruptions and inconveniences that result from the threat being made. *Id.* The Third Circuit referred to Justice Marshall's statement in his concurring opinion in *Rogers v. United States* that "[a] threat made with no present intention of carrying it out may still restrict the President's movements and require a reaction from those charged with protecting the President." *Id.* (quoting *Rogers,* 422 U.S. at 46–47, 95 S.Ct. 2091 (J. Marshall, concurring)). The objective standard "best satisfies the purposes of § 871, since it recognizes the power of a threat to hinder the President and his aides in the performance of their duties, even when the threatmaker has no intention of carrying out the threat and there is no actual danger to the President." *Id.* at 557.

In the report accompanying § 879, the House Judiciary Committee acknowledged that there had been disagreement among the courts in the construction of "knowingly and willfully" as used in § 871, with some courts not requiring evidence that

the individual speaker intended to carry out the threatened act, and other courts expressing "their concern that an overly broad interpretation of this term could in effect punish speech protected by the First Amendment." H.R.Rep. No. 97–725, at 3–4 (1982), U.S.Code Cong. & Admin.News 1982, p.2624. The Committee then addressed these issues:

> With regard to section 879, the Committee recognizes the need to protect the safety of protectees of the Secret Service and their ability to function free of fear. Moreover, the Committee recognizes the fundamental interests shared by all Americans in free and uninhibited speech, especially where public figures are concerned. Therefore, the Committee construes a threat that is "knowingly and willfully" made as one which the maker intends to be perceived as a threat regardless of whether he or she intends to carry it out. A prosecution under this section would not only require proof that the statement could reasonably be perceived as a threat, but would also require some evidence that the maker intended the statement to be a threat.

> Objective circumstances would bear upon the proof of both subjective intent and objective perceptions. For example, if a person were serving a term of life imprisonment without the possibility of parole and therefore objectively could not be perceived as presently able to effect a threat to kill a protectee next week, this circumstance should bear upon whether a communication by the person would be considered as "knowingly and willfully" made. In other

---

4. As one might expect, most of the cases dealing with § 871 involve threats against the President. We note, however, that § 871 is broader than the case law might suggest. It includes threats against the President-elect,

Vice President, Vice President-elect, and the officers next in the order of succession to the office of President, which would include the Speaker of the House and others.

words, objective circumstances can bear upon the question of subjective intent, as in a situation where a threatened act would be patently infeasible.

*Id.* at 4.

Few courts have had the opportunity to consider the issue of whether the Committee's Report provides a sufficient basis for interpreting the language of § 879 to require a subjective intent standard. In *United States v. Kosma,* 749 F.Supp. 1392 (E.D.Pa.1990), the defendant had been charged with making threats on the life of a current president and a former president, in violation of §§ 871(a) and 879(a). The district court determined that under § 871(a), the government was not required to prove that the defendant had the actual intent to execute the threat. *Id.* at 1399. With respect to the § 879 offense, the court relied on the House Judiciary Committee Report and concluded that the government not only had to demonstrate that the charged statement could reasonably be perceived as a threat, but also that the defendant intended the statement to be a threat, thus incorporating a subjective test into § 879.[5] *See id.* at 1401. The court found that the government had met its burden for the objective requirement. *Id.* at 1402. It concluded that the defendant's statement, "21 guns are going to blow holes in your heart and brains. You should pick an honorable way to die," could reasonably be perceived as a threat. *Id.* However, the court found that the government had not met its burden with regards to the subjective requirement because it could not demonstrate beyond a reasonable doubt that the defendant had intended his statement to be a threat. *Id.* The court considered important the fact that the defendant was incarcerated at the time he had sent the letter containing the threats, because it demonstrated that the act which the defendant threatened was not feasible in the short term. *Id.* In addition, while expert testimony established that the defendant understood the meaning of the statement and the concept of threat, the court weighed the testimony concerning the defendant's mental state and the fact of the defendant's incarceration to conclude that the government had not met its burden of proof. *Id.*

On appeal to the Third Circuit, the district court's interpretation of § 879 was not an issue, and the Third Circuit specifically declined to express an opinion on the subject. *Kosma,* 951 F.2d at 552 n. 4. Although the Third Circuit noted that the district court did not explain why § 879 should be treated differently from § 871, it offered a possible explanation, indicating that "there is arguably less reason to be concerned from a national security standpoint when a threat is made against a former President than when it is made against a current President." *Id.* at 552 n. 5.

We have found only two additional opinions that discuss the intent requirement of § 879. In *United States v. Gordon,* 974 F.2d 1110 (9th Cir.1992), *overruled on other grounds by Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists,* 290 F.3d 1058 (9th Cir.2002), *as recognized in United States v. Hanna,* 293 F.3d 1080, 1088 n. 5 (9th Cir.2002), the defendant climbed over a wall and entered the property of former President Ronald Reagan. *Id.* at 1113. When apprehended by the Secret Service, the defendant made statements that the former President was the "anti-Christ" and "must be killed and I must kill him." *Id.* Citing the House Judiciary Committee

---

**5.** We note that, unlike the instant case, during the trial in *Kosma,* the government did not object to a heightened subjective standard for § 879. *Kosma,* 749 F.Supp. at 1401.

Report, the Ninth Circuit concluded that § 879 required not only that the jury find that the statement was a threat under the objective standard, but also that the jury find that the defendant "intended the statements to be taken as threats." *Id.* at 1117. The court noted that the fact that the defendant was in custody and unarmed when he made the statements—and therefore was unable to carry out the threat— was "relevant to the jury's consideration of whether that person possessed the requisite subjective intent." *Id.* at 1117–18 (citing H. Rep. No. 97–725, at 4). However, the court concluded that the circumstances of the case supported the jury's finding that the defendant had intended his statements to be a threat. *Id.*

In contrast to *Gordon,* the Second Circuit concluded that § 879 requires only proof of a statement that a reasonable person would perceive as a threat. *United States v. Johnson,* 14 F.3d 766, 771 (2d Cir.1994). In *Johnson,* the defendant had told a recreational therapist that he intended to kill then President Bush and subsequently told a Secret Service agent that he intended to kill both President Bush and former President Reagan. *Id.* at 767. The Second Circuit emphasized that "[i]t is well settled that § 871 requires only a showing of general intent." *Id.* at 768. Addressing the intent requirement for § 879, the *Johnson* court noted that at the time of § 879's enactment, the objective standard of "knowingly and willfully" in § 871 was widely accepted in the federal courts. "The fact that Congress chose to adopt this and other substantially identical language in enacting § 879, which addresses a concern parallel to that engaged by § 871, bespeaks an intention to import the established general intent interpretation of § 871 into the new statute." *Id.* at 770; *see also United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20 (2d Cir.1989). Thus, the court determined that " § 879 requires proof only of general intent." *Johnson,* 14 F.3d at 770.

The *Johnson* court recognized that the *Gordon* court and the district court in *Kosma* had concluded that the statute posited a specific intent crime based on their analyses of the House Judiciary Committee Report. *Id.* However, the court found that the Report was not helpful, stating that the Report's language provided "hazardously uncertain guidance in interpreting § 879." *Id.* at 771. Indeed, according to the Second Circuit, the Report only added confusion to the issue of the proof necessary with respect to § 879: "While the Report would require *'proof'* that a defendant's statement could 'reasonably be perceived as a threat,' it would require only *'some evidence* that the maker intended the statement to be a threat.'" *Id.* The Second Circuit concluded that the "problematic legislative history" of the statute was not sufficient to overcome the presumption that Congress intended to preserve the settled judicial interpretation of § 871 when it enacted § 879 with identical language. *Id.; see Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("There are, we recognize, contrary indications in the statute's legislative history. But we do not resort to legislative history to cloud a statutory text that is clear."), *cited in Johnson,* 14 F.3d at 771.

We find the rationale of the Second Circuit in *Johnson* to be compelling. While the House Judiciary Committee's Report sheds some light on the issues Congress faced when enacting § 879, the Report, which is authored by the members of the Committee only and not by Congress at large, is not particularly helpful in interpreting the language of § 879. As Justice Scalia has stated:

The meaning of terms on the statute books ought to be determined, not on the basis of which meaning can be shown to have been understood by a larger handful of the Members of Congress; but rather on the basis of which meaning is (1) most in accord with context and ordinary usage, and thus most likely to have been understood by the *whole* Congress which voted on the words of the statute ... and (2) most compatible with the surrounding body of law into which the provision must be integrated.

*Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 528, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring in the judgment), *cited in Johnson*, 14 F.3d at 771. Furthermore, the legislative history of § 871 indicates that Congress faced similar issues regarding the appropriate standard of intent for that statutory provision. For example, Congressman Webb, responding to a proposal to strike "willfully" from the bill's language, stated:

I think it must be a willful intent to do serious injury to the President. If you make it a mere technical offense, you do not give him much of a chance when he comes to answer before a court and jury. I do not think we ought to be too anxious to convict a man who does a thing thoughtlessly. I think it ought to be a willful expression of an intent to carry out a threat against the Executive....

53 Cong. Rec. 9378 (1916) (statement of Rep. Webb). Notwithstanding the legislative history of § 871, courts have almost universally agreed that an objective standard for "willfully" is appropriate.

In addition, the purpose of § 879 and the purpose of § 871 are substantially the same. A parallel interpretation of the phrase "knowingly and willfully" as used in both statutes is therefore justified. While the Third Circuit in *Kosma* noted in dicta

that there could be a distinction from a national security standpoint between a threat made against a former President and one made against a current President, which in turn could justify different intent standards in § 871 and § 879, *Kosma*, 951 F.2d at 552 n. 5, § 871 covers threats made against not only the current President, but also the President-elect, Vice President, Vice President-elect, "or other officer next in the order of succession to the office of President of the United States." 18 U.S.C. § 871. Thus, the national security issue that has compelled courts to require an objective standard of proof for "willfully" in § 871 applies to officials other than the President. It is logical to conclude that these same security issues should apply no differently to former Presidents and their immediate family members. Members of Congress recognized these security issues during the debates concerning H.R. 6168, the bill that became § 879. *See, e.g.*, 128 Cong. Rec. 21218 (statement of Rep. Moorhead) ("All of the new persons covered under H.R. 6168 are already protectees of the Secret Service. They are individuals of high visibility and are most likely to receive serious threats."); *id.* (statement of Rep. McClory) (the Secret Service's protective job "is hampered by the fact that there is no Federal threat statute" that covers individuals covered under H.R. 6168). Even the Ninth Circuit, which requires a heightened standard under § 879, recognized that § 879 serves an important purpose similar to that of § 871, stating that the provision "aids in protecting former Presidents by allowing the Secret Service to respond more effectively to threats against them." *Gordon*, 974 F.2d at 1115.

Finally, the recommendation in the Committee's Report that the government provide "some evidence" that the maker intended the statement at issue to be a

threat is potentially incompatible with the constitutional mandate that the government prove the elements of a crime "beyond a reasonable doubt." *See Johnson*, 14 F.3d at 771. Without definitive evidence that Congress, as a whole, intended a heightened intent standard for § 879, we are compelled to interpret the statute in the same fashion as the Third Circuit has interpreted § 871. We therefore conclude that the phrase "willfully" as used in § 879 requires only that the Government demonstrate, beyond a reasonable doubt, that "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of" Senator Clinton. *Kosma*, 951 F.2d at 557.[6]

### C. Analysis Under § 879(a)(1)

■ Defendant's statements at the shelter on January 24, 2005 included the statement, "I'm going to put two bullets into Senator Clinton." This satisfies the requirement of § 879(a)(1) that the statements threaten to inflict bodily harm upon a member of the immediate family of a former President. As previously discussed, the trial record establishes beyond a reasonable doubt that Defendant made these statements knowingly.

The remaining issue is whether Defendant made the statements at the shelter "willfully," such that a reasonable person would perceive his statements to be serious expressions of his intent to harm Senator Clinton. It is clear that the people at the shelter who heard Defendant's threats perceived them as serious. In response to Defendant's statements, Miller notified the shelter security personnel. Miller also remained close at hand when Blitman spoke to Defendant in case she needed further assistance. The people in the dinner line moved away from Defendant as he made these threats. A member of the staff was alarmed by the statements and, at one point, Miller himself registered fear. All of these reactions are evidence that reasonable people perceived Defendant's statements to be serious threats.

Most significantly, the staff at the shelter decided to remove Defendant from the shelter. They did not want to allow someone who was talking about shooting Hilary Clinton and killing white people to remain at the shelter overnight. They were afraid that he might lose control. Defendant was involuntarily committed at the Hall Mercer Clinic.[7] (Trial Ex. G–3.)

---

**6.** Prior to trial, Defendant filed Defendant's Motion In Limine (Doc. No. 40) and Defendant's Second Motion In Limine (Doc. No. 44), and the Government filed Government's Motion In Limine (Doc. No. 42). Based upon the trial memoranda submitted by counsel, it was apparent that one of the major disputed issues in this matter is the meaning of the statutory language in § 879, specifically the meaning of the term "willfully" as used in the statute. The decision of the Court on this issue is in large measure determinative of the evidentiary issues raised in the Motions In Limine. Because this matter has been tried non-jury, the Court heard all of the evidence, including the evidence disputed in the Motions In Limine, with the understanding that it would consider only that evidence that is relevant after determining the definition of "willfully." Having determined that "willfully" requires an objective standard rather than a subjective standard, we have considered as relevant only the testimony of Fred Purdie, Nurse Donald Steele, and the Secret Service letter dated February 3, 2005 regarding Senator Clinton's visit to Philadelphia. (Trial Ex. G–8). Accordingly, the Motions In Limine are granted except as to the testimony of Purdie and Steele, and the Government's Trial Exhibit G–8.

**7.** The application for Defendant's involuntary commitment to Hall Mercer, which was signed by Marc Miller, had a check next to the following statement:

The evidence is more than sufficient to establish that a reasonable person would foresee that Defendant's statements would be perceived as serious threats by those hearing them. Accordingly, the Government has established beyond a reasonable doubt that Defendant willfully made the statements threatening Senator Clinton.

## III. CONCLUSION

The Government has met its burden of proving each and every element of the crime set forth in 18 U.S.C. § 879 beyond a reasonable doubt. Accordingly, the Court finds Defendant Maurice Richards guilty on Count One of the Indictment.[8]

Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is reasonable probability that such conduct will be repeated. A clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.
(Trial Ex. G–3.)

8. Defendant's Motion For Judgment Of Acquittal under Federal Rule of Criminal Procedure 29 (Doc. No. 51) is denied.