

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-2008

# USA v. Richards

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1794

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Richards" (2008). *2008 Decisions.* Paper 1362.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1362

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No:  06-1794

UNITED STATES OF AMERICA

v.

MAURICE RICHARDS,
Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 05-cr-00151)
District Judge: Hon. R. Barclay Surrick

Argued: June 14, 2007

Before: McKEE, *Circuit Judge*, and STAPLETON
and NYGAARD, *Senior Circuit Judges*

(Opinion filed:   March 31, 2008 )

MAUREEN KEARNEY ROWLEY, ESQ.
Chief Federal Defender
DAVID L. McCOLGIN, ESQ.  (Argued)
Chief Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 540 West – Curtis Center
601 Walnut Street
Philadelphia, PA 19106
*Attorneys for Appellee*

1

PATRICK L. MEEHAN, ESQ.
United States Attorney
ROBERT A. ZAUZMER, ESQ.
Assistant United States Attorney
Chief of Appeals
MANISHA M. SHETH, ESQ.  (Argued)
616 Chestnut Street
Suite 1250
Philadelphia, PA 19106

OPINION

McKEE, *Circuit Judge*.

Maurice Richards appeals his conviction for "knowingly and willfully" threatening to kill or inflict bodily harm on a member of the immediate family of a former President, in violation of 18 U.S.C. § 879(a)(1).  For the reasons that follow, we will reverse.

## I.

Inasmuch as we are writing primarily for the parties who are familiar with this case, we need not set forth the factual or procedural background except insofar as is helpful to our discussion.[1]

After Richards waived his right to a jury trial, both he and the government filed motions *in limine* to preclude certain evidence from being admitted based upon

---

[1] For a detailed recitation of the factual background of this case *see, United States v. Richards*, 415 F. Supp. 2d 547, 549-50 (E.D. Pa. 2005).

competing interpretations of the willfulness element of § 879. Richards contended that the statute requires a showing of subjective intent; *i.e.* proof that he actually intended his statements to be perceived as a threat. However, the government argued it need only establish that a reasonable observer would have perceived the statements as a threat to satisfy its burden under of § 879. Inasmuch as this was to be a bench trial, the court decided to reserve ruling on the motions and hear the disputed evidence with the understanding that it would only consider the relevant evidence after determining whether § 879 required proof of subjective intent as argued by Richards, or objective intent as argued by the government.

The evidence at trial included the conflicting psychiatric testimony of Dr. Robert Sadoff who testified for Richards, and Dr. Timothy Michals, who testified in rebuttal for the government. Despite their disagreement on some issues, they agreed that Richards was psychotic at the time of the incident that lead to his indictment.

Dr. Sadoff concluded that Richards' "threats" "were a product of his psychotic thought disorder [and] were not clearly thought through." App. 204. In his written report, Dr. Sadoff had diagnosed Richards with "chronic schizophrenia, with paranoid features." App. 353. He opined that Richards' statements were delusional, not specifically directed toward anyone, and concluded that Richards did not intend to threaten Mrs. Clinton or cause concern for her safety. *Id*.

Although Dr. Michals agreed that Richards was psychotic and "severely mentally

3

disabled," he disagreed with the diagnosis of schizophrenia with paranoid features. App. 271-72. Dr. Michals believed that Richards made his statements about Mrs. Clinton knowingly, and concluded that Richards had "some awareness" of his actions because he stopped chanting about Hillary Clinton whenever Miller was in his line of sight. App. 250-51.

The district court convicted Richards of violating 18 U.S.C. § 879(a)(1). The court reasoned that although some at the shelter were laughing at Richards, staff members were sufficiently concerned to remove Richards from the shelter. *United States v. Richards*, 415 F. Supp. 2d 547, 550-52 (E.D. Pa. 2005). The district court found that the statements were "knowingly" made insofar as they were made voluntarily and intentionally, and not as the result of mistake, duress or coercion. *Id*. at 552-53. It also concluded that the willfulness element was satisfied. The court believed that the test for willfulness is an objective one as the government had argued. Thus, the government only needed to prove that a reasonable person would perceive Richards' statements as a threat. *Id*. at 553-58. Because the district court found that the test for willfulness is an objective one, it did not consider the psychiatric testimony.[2] *Id*. at 559 n.6. This appeal followed.

## II. DISCUSSION

---

[2]Procedurally, because the district court did not consider any psychiatric testimony based on its holding on the willfullness requirement, the district court granted the government's motion to preclude psychiatric testimony.

4

The district court concluded that the willfulness element of § 879 only requires objective intent. More specifically, the district court held:

> [T]he phrase "willfully" as used in § 879 requires only that the Government demonstrate, beyond a reasonable doubt, that "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or take the life of" Senator Clinton.

415 F. Supp. 2d at 558 (citing *United States v. Kosma*, 951 F.2d 549, 557 (3d Cir. 1991) (interpreting the term "willfully" in 18 U.S.C. § 871, threats against the President).

In explaining how the evidence satisfied that standard, the court wrote:

> It is clear that the people at the shelter who heard Defendant's threats perceived them as serious. . . Miller notified the shelter security personnel. Miller also remained close at hand when Blitman spoke to Defendant in case she needed further assistance. The people in the dinner line moved away from Defendant as he made these threats. . . and, at one point, Miller himself registered fear. All of these reactions are evidence that reasonable people perceived Defendant's statements to be serious threats.

> Most significantly, the staff at the shelter decided to remove Defendant from the shelter. They did not want to allow someone who was talking about shooting Hillary Clinton and killing white people to remain at the shelter overnight. They were afraid that he might lose control. Defendant was involuntarily committed at the Hall Mercer Clinic.

415 F. Supp. 2d at 558-59.

Although Richards still contends that § 879 requires subjective intent, he assumes *arguendo* for purposes of this appeal that the court's objective test is correct, and he

5

argues that the evidence was insufficient to satisfy even that standard. We agree.[3]

The only two people who testified that they heard Richards chanting about putting "bullets into Hillary Clinton" were case manager Miller and mental health clinician Blitman. Miller testified that he did not consider Richards' chanting to be a serious threat to Hillary Clinton, App. 131, and both testified that they saw no reason to be concerned for Hillary Clinton's safety. App. 113, 146. Therefore, their reaction does not satisfy the objective test. We simply can not agree that the evidence establishes an objective test for willfulness if the only people who heard Richard's utterances about Hillary Clinton did not regard them as serious threats and saw no reason to be concerned for Hillary Clinton's safety. The court's finding that "[i]t is clear that the people at the shelter who heard Defendant's threats perceived them as serious," 415 F. Supp. 2d at 558, is simply not supported by the record and is therefore clearly erroneous.[4]

---

[3]"We apply a particularly deferential standard of review when deciding whether a [] verdict rests on legally sufficient evidence." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). "It is not for us to weigh the evidence or to determine the credibility of the witnesses." *Id*. (citation omitted). "Rather, we must view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (citations and internal quotations omitted). "Thus, a claim of insufficiency places a very heavy burden on an appellant." *Id*. (citation and internal quotations omitted).

[4]In *United States v. 15 Bosworth Street*, 236 F.3d 50 (1st Cir. 2001), the court of appeals wrote:

When a district court conducts a bench trial, its legal determinations engender de novo review. This includes its determinations about the sufficiency of the evidence. In contrast, the court's factual findings are

(continued...)

6

The district court ignored testimony that neither Miller nor Blitman saw any reason to be concerned for Senator Clinton's safety. Instead of addressing that testimony, the court relied upon five "facts" that it believed established that the willfulness element of § 879. First, the district court noted that "Miller notified the shelter personnel." 415 F. Supp.2d at 558. However, Miller made it clear that he notified security pursuant to normal operating procedure, and not because he viewed anything Richards said as a serious threat to anyone, let alone Hillary Clinton. In fact he emphasized that he did not regard Richards as a threat. He explained: "I went to tell security just that here was a potential issue, nothing to be worried about, . . . [T]his wasn't all that abnormal up to this point. . . I don't think I stressed that where was anything major going on." App. 79-80. Miller clarified that "similar incidents" requiring him to alert security "were quite common at the shelter." App. 80.

Second, the district court wrote that "Miller also remained close at hand when Blitman spoke to Defendant in case she needed further assistance." 415 F. Supp.2d at 558. However, the district court failed to note that Miller was once again simply following the shelter's protocol. Miller testified that his reaction was: "[j]ust kind of

---

[4](...continued)
entitled to considerable deference. . . . Despite the deference due, an appellate court will displace factual findings in the aftermath of a bench trial if those findings are clearly erroneous.

*Id*. at 53.

7

standard . . . we just basically back each other up in whatever capacity we can. So, if he didn't respond well to her or something like that, I would be right there." App. 20. Given Miller's explanation, we do not believe that his remaining "close at hand" can support an inference that he took Richards' chanting as a serious threat to Hillary Clinton. Rather, as Miller testified, his concern was for Richards' mental health. App. 102.

Third, the district court noted that "[t]he people in the dinner line moved away from Defendant as he made these threats." 415 F. Supp.2d at 558. However, that hardly supports the inference that the district court drew, even given our differential standard of review. Miller testified: "I think some people sitting close to him were . . . keeping a little distance from him," App. 69, and "I think they were moving away from him a little bit, yes." App. 129. However, given Richards' disheveled and malodorous state, it is not surprising that people moved away from him when he became loud. People normally keep their distance from a disheveled, homeless person engaging in psychotic behavior. The fact that some people in the line moved away from Richards does not, without more, support an inference that a reasonable observer would believe Richards was threatening Hillary Clinton.. Moreover, any such inference is seriously undermined not only by the totality of the circumstances including Richards' disheveled state, but by the testimony of Blitman and Purdie that some people near Richards were actually laughing at him.

Fourth, the district court also noted that a "member of the staff was alarmed by the

8

statements and, at one point, Miller himself registered fear." 415 F. Supp.2d at 558.

However, that was not in response to Richards' chants about Hillary Clinton. Rather, that occurred after dinner, when Purdie and Miller spoke with Richards. At that point, Richards did not make any statements about Hillary Clinton. "He was just ranting about white people." App. 162. He started screaming about "cutting heads off" and "hating white people." App. 86-87. The alarm that certain people registered was a reaction to Richards' racist and psychotic ranting. Richards was no longer talking about shooting Hillary Clinton, and there was no evidence that Brian heard the earlier statements about Hillary Clinton.

Lastly, the district court explained: "Most significantly, the staff at the shelter decided to remove Defendant from the shelter. They did not want to allow someone who was talking about shooting Hillary Clinton and killing white people to remain at the shelter overnight. They were afraid he might lose control." 415 F. Supp.2d at 558. Far from being the most significant aspect of the government's proof, we feel the reasoning behind removing Richards from the shelter establishes conclusively that objective observers did not take his ranting about Hillary Clinton seriously. Miller testified that they removed Richards and had him committed solely based on a concern for Richards' health and safety, not because of *any* concern for the safety of Hillary Clinton. App. 102. The fact that Hillary Clinton is a white woman in no way establishes that Richards' generalized rants about white women constitute threats to her within the meaning of §

9

879.

Miller testified, "I would not have felt comfortable, at the end of my shift, knowing that somebody had just screamed things about, you know, killing people." App. 118. Miller immediately clarified that the screaming he was referring to did not involve the statements about shooting Hillary Clinton. The statements about Clinton were "the mumbling and chanting to himself; and those were not the subject of the screaming." App. 119.

Furthermore, the fact that the staff would simply have put Richards out on the street if it had not been too cold to do so clearly establishes that they saw no reason to be concerned for Hillary Clinton's safety. Miller testified that they opted for involuntary commitment because it was cold outside and Miller "didn't like the chances of [Richards] finding a heating grate." App. 90. Had the staff perceived his chanting about Hillary Clinton to be a serious threat, they certainly would not have put him back on the street where he would have access to all manner of weapons.

Interestingly, the government does not directly address the fact that the only people who heard Richards' statements about Hillary Clinton were Miller and Blitman and that they did not consider those statements to be serious. Instead, the government suggests that Miller's and Blitman's testimony is not that reliable because they work in a homeless shelter and they hear people making threatening statements all the time. In the government's view, they are much more tolerant than the average observer in reacting to

10

threats.  However, we believe the reverse to be true.  Their background puts them in a far

better position to make an objective assessment of Richards' behavior and utterances

than the average person who is unfamiliar with psychotic behavior.

## IV.  CONCLUSION

For the reasons set forth above, we conclude that there is insufficient evidence to

sustain Richard's conviction for violating 18 U.S.C. § 879(a)(1).  Therefore, we will

reverse the judgment of the District Court and remand with instructions to vacate the

judgment of conviction and instruct the district court to enter a judgment of acquittal.[5]

---

[5] Given our holding, we need not address whether Richards' utterances constituted "true threats" or protected speech.  *See Watts v. United States*, 394 U.S. 705 (1969).